UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) |  |
| MATTHEW N. MURRAY, | ) | Case No. 14-10271 (REG) |
|  | ) |  |
| Alleged Debtor. | ) |  |
|  | ) |  |

DECISION AND ORDER ON MOTION
TO DISMISS INVOLUNTARY PETITION

APPEARANCES:

WILK AUSLANDER LLP
*Pro Se*
1515 Broadway, 43rd Floor
New York, New York 10036
By:    Eric J. Snyder, Esq. (argued)
       Kimberly Reilly, Esq.

KLESTADT & WINTERS, LLP
*Counsel for Matthew N. Murray*
570 Seventh Avenue, 17th Floor
New York, New York 10018-6314
By:    Tracy L. Klestadt, Esq. (argued)
       Brendan M. Scott, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

The Petitioning Creditor Wilk Auslander LLP (the "**Law Firm**"), the assignee of a

judgment (the "**Judgment**") originally obtained by its client (and then assigned to the Law Firm

on account of unpaid fees), seeks to enforce that Judgment.  To that end, the Law Firm filed this

involuntary chapter 7 case, as the sole petitioning creditor—*and only creditor,* petitioning or

otherwise—of the Alleged Debtor Matthew N. Murray ("**Murray**").  Shortly thereafter, Mr.

Murray filed the motion now before this Court: to dismiss this case, for cause, under Bankruptcy

Code section 707(a), and for an award of sanctions.  Mr. Murray asserts, among other things, that

the Law Firm filed the petition in bad faith.

This case presents a variant of a common practice in cases in this Court and elsewhere—

the filing of a case under the Bankruptcy Code as a tactic in a two-party dispute—though much

more commonly in such situations, the abuser is the debtor and not a creditor.  But raising much

more serious institutional concerns, Mr. Murray's motion requires the Court to consider whether

an involuntary bankruptcy case, with only a single creditor,[1] appropriately can be used simply as

a judgment enforcement mechanism:  here, to enable a judgment creditor to exploit mechanisms

to monetize a spousal interest in property jointly held with a debtor that are available only in a

bankruptcy case.

---

[1]  Mr. Murray holds out the possibility that his wife, "who has advanced funds to enable the Alleged Debtor [Mr. Murray] to live," Murray Opening Br. (ECF No. 10) ("**Murray Opening Br.**") at 8-9, might have claims against him as well.  The Court doubts that; spouses support each other all the time, and honoring such claims would risk serious distortions in the bankruptcy system, to often material detriment to creditors with non-insider claims.  But in any event, Mr. Murray's wife "has acknowledged to the Petitioning Law Firm that she can receive no repayment from the Alleged Debtor while the R&R Judgment and its attendant restraining notices remain outstanding," *id.* at 9, and there are no other creditors in this case.  It plainly is appropriate, given all of these realities, to continue to refer to the case has having no creditors other than the Law Firm.

For reasons set forth below, the Court concludes that this filing is an inappropriate invocation—and exploitation—of the bankruptcy system. Before it expanded to achieve other societal goals (none applicable here), bankruptcy was created as a *collective remedy*, to achieve *pari passu* distribution amongst creditors—not as a single creditor's judgment enforcement device. Here—where the filing arises solely from a two-party dispute; the bankruptcy case was filed solely as a judgment enforcement mechanism; the filing has been made solely to achieve a result unavailable under nonbankruptcy law; where there are no other creditors' needs and concerns to protect; and where there are no other bankruptcy goals to achieve—the Court will not countenance misuse of the bankruptcy system in this way.

Whether for "bad faith filing," or merely unenumerated cause, the petition must be, and is, dismissed for cause.[2]

The Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion in connection with this determination follow.

<u>Facts</u>[3]

The Law Firm (acting as both the petitioning creditor and its own counsel) filed this involuntary chapter 7 case against Mr. Murray in February 2014. The Law Firm is the only

---

[2]      However, in the exercise of its discretion, the Court declines to grant Mr. Murray's request for an award of sanctions. Though for all of the reasons discussed below the Court does not regard the issues here as close, there has been no decision to date expressly forbidding the Law Firm's conduct here.

But because this filing is so obviously inappropriate, the Court need not consider Mr. Murray's alternative argument that the case should be dismissed under the abstention provision of the Bankruptcy Code, section 305, nor need the Court pursue its doubts as to whether the Law Firm established (as was its burden) the requirements for an order for relief under section 303—and in particular, whether Mr. Murray, who has no other creditors, was generally not paying his debts when they became due.

[3]      In accordance with the Court's Case Management Order, undisputed facts in motion papers are taken as true. The Court relies solely on undisputed facts. To minimize the length of this Decision, citations are limited to quotations and the most important matters.

creditor in this case.[4]  Mr. Murray has no income,[5] and his only material asset is an interest in a

tenancy by the entirety with his wife in the apartment in which they reside.[6]

The Law Firm is the present holder, by assignment, of a judgment claim against Mr.

Murray (in the approximate amount of $19 million), which remains unsatisfied to date.

The Law Firm's claim arises out of a Financial Industry Regulatory Authority

("**FINRA**") arbitration award, obtained by Mr. Murray's former employer, Rodman & Renshaw

("**R&R**").  In 2006, Mr. Murray made disclosure to the U.S. Senate Finance Committee of intra-

company electronic communications which Mr. Murray believed were suggestive of improper

business activity within R&R.[7]  He was fired by R&R shortly thereafter.[8]  Mr. Murray

subsequently contributed to two New York Times articles regarding the alleged improper

activity.[9]  After that, he was dismissed by R&R, and R&R commenced the FINRA arbitration

against him—alleging, among other things, that he had defamed R&R and was liable for breach

of contract.[10]  The FINRA panel issued an award in favor of R&R, in the amount of

$10.7 million, which later swelled to $16 million[11] with the accrual of pre-judgment interest, at

the CPLR's 9% rate.  The FINRA arbitration award was confirmed in New York State Supreme

---

[4]  Though the right is not commonly invoked in this Court (and though this Court scrutinizes single-creditor involuntary petitions with extra care, as they are so often subject to abuse), the Bankruptcy Code permits an involuntary petition to be filed by only a single creditor when there are fewer than 12 holders of qualifying claims.  *See* section 303(b)(2).

[5]  First Murray Aff. ¶ 25, dated March 18, 2014, ECF No. 12 ("**First Murray Aff.**"), and Exh. G to the First Murray Aff; Exh. B to First Snyder Decl., ECF No. 2-2.

[6]  First Murray Aff. ¶ 25 and Exh. G to the First Murray Aff.

[7]  First Murray Aff. ¶¶ 3-16.

[8]  *Id.* ¶ 12.

[9]  *Id.* ¶¶ 13-18.

[10]  *Id.* ¶ 20.

[11]  *Id.* ¶ 22.

Court, and its determination was affirmed by the Appellate Division.[12]  According to the Law

Firm,[13] the Judgment swelled further to over $19 million, with the accrual of post-judgment

interest, again at a 9% rate.

Thereafter, R&R filed a voluntary chapter 7 case,[14] and the Judgment was assigned by

R&R's chapter 7 trustee to the Law Firm, with R&R's chapter 7 estate sharing in any recovery

on it.

Mr. Murray holds an interest with his wife, as tenants by the entirety, in the shares of a

cooperative apartment (the "**Apartment**").[15]  Mr. Murray, his wife, and their two children

currently reside at the Apartment.[16]

The reason for the Law Firm's resort to the bankruptcy system is obvious, and

admitted.[17]  As a judgment creditor, the Law Firm has the ability, under nonbankruptcy law

(here, New York law), to execute on Mr. Murray's interest in the Apartment and to cause it to be

sold in a judgment execution sale.[18]  But the judgment the Law Firm acquired was solely against

Mr. Murray—and not against his wife.  And the sale of Mr. Murray's interest alone would fetch

---

[12]    *Id.* ¶ 23.

[13]    *See* Law Firm Opp. Mem. (ECF No. 19) ("**Law Firm Br.**") at 8.

[14]    *In re Rodman & Renshaw LLC*, Case No. 13-10087 (Bankr. S.D.N.Y.) (REG).

[15]    First Snyder Decl. (ECF #2-9) ("**First Snyder Decl.**") ¶ 14.  Following the entry of the Judgment, but
        before it filed the involuntary petition in this case, the Law Firm engaged in post-judgment discovery in an
        effort to identify Mr. Murray's assets.  In the course of that discovery, Mr. Murray disclosed a number of
        transfers in 2010—possibly fraudulent transfers, though not obviously so.  *See* Second Murray Aff., dated
        June 6, 2014 (ECF No. 24) ("**Second Murray Aff.**") ¶¶ 5-8.

        But of course, if any of the transfers Mr. Murray disclosed were fraudulent transfers, they could be avoided
        under state law by a creditor without the need to file a bankruptcy case.  *See* N.Y. Debtor & Creditor L.
        § 271 et seq.

[16]    First Murray Aff. ¶ 34.

[17]    *See* Law Firm Br. at 18-19 (arguing, as a reason that the bankruptcy court should allow the case to
        continue, that the "Bankruptcy Court Provides Petitioning Creditor with the Possibility of Relief that is
        Unavailable to it in State Court").

[18]    *See In re Waxman*, 128 B.R. 49, 51 (Bankr. E.D.N.Y. 1991) (Eisenberg, J.) (explaining New York law).

less in a sale than it would if he were the sole owner, because New York state law respects the

rights of a tenant by the entirety.  New York law would permit the Law Firm to execute on Mr.

Murray's interest in the Apartment, but not on the entire interest held by both Mr. Murray and

his wife.[19]

By contrast, the Bankruptcy Code includes provisions with the potential to increase the

amount that can be realized when jointly held property is sold.  Section 363 of the Code provides

in substance that when the requirements of section 363(h), quoted in full below,[20] and its

companion provisions[21] are satisfied, a bankruptcy trustee can sell the jointly held property free

---

[19]     *See* Law Firm Br. at 19-20 (explaining why it is unhappy with the applicable New York law).

[20]     Section 363(h) provides:

> (h) Notwithstanding subsection (f) of this section, the trustee
> may sell *both* the estate's interest, under subsection (b) or (c) of this
> section, *and the interest of any co-owner* in property in which the
> debtor had, at the time of the commencement of the case, an undivided
> interest as a tenant in common, joint tenant, or tenant by the entirety,
> only if—
>
>> (1) partition in kind of such property among the estate and
>> such co-owners is impracticable;
>>
>> (2) sale of the estate's undivided interest in such property
>> would realize significantly less for the estate than sale of such
>> property free of the interests of such co-owners;
>>
>> (3) the benefit to the estate of a sale of such property free of
>> the interests of co-owners outweighs the detriment, if any, to
>> such co-owners; and
>>
>> (4) such property is not used in the production, transmission,
>> or distribution, for sale, of electric energy or of natural or
>> synthetic gas for heat, light, or power. (emphasis added).

[21]     Two other related subsections follow section 363(h).  The first of them, section 363(i), provides some
modest protection to the debtor's spouse or co-owner, by which she or he can avoid the sale.  It provides, in
relevant part:

> Before the consummation of a sale of property to which subsection …
> (h) of this section applies … the debtor's spouse, or a co-owner of such
> property, as the case may be, may purchase such property at the price at
> which such sale is to be consummated.

The second of them deals with the proceeds.  Section 363(j) provides, in relevant part:

> After a sale of property to which subsection … (h) of this section
> applies, the trustee shall distribute to the debtor's spouse or the co-
> owners of such property, as the case may be, and to the estate, the

and clear of both owners' interests, without the co-owners consent, leaving the nondebtor only with a right of first refusal to match the sale offer (and thus to stay in residence), and with her share of the proceeds of the forced sale.

The Law Firm wants the bankruptcy case to proceed to effect the sale of the Apartment by means of Bankruptcy Code section 363(h), even though its realization on that sale would be diluted by the commissions and fees of a chapter 7 trustee.[22]

Discussion

I.

Compliance with Section 303

Mr. Murray does not dispute that the Law Firm's petition complies with section 303 of the Code,[23] which authorizes the filing of involuntary petitions, in certain instances, by only a single creditor. An involuntary petition (filed under section 303 of the Code), like the much more common voluntary petition (filed under section 301 of the Code), can result in an "order for relief" which would cause a case under the Code (as applicable here, under chapter 7) then to be pending.

Accordingly, the Court assumes, for the purposes of this analysis, that if there were not cause for dismissal, the involuntary case commenced by the Law Firm's could continue.

---

proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of such spouse or co-owners, and of the estate.

[22]    The Law Firm's realization would not be diluted, however, by the recoveries of any other creditors, because there *are no other* creditors here.

[23]    *See* Murray Opening Br. at 8 ("Although the Petitioning Law Firm appears to meet the technical statutory requirements under 11 U.S.C. § 303(b)….").

## II.

Dismissal for Bad Faith
Filing and Other Cause

But even when a case under the Bankruptcy Code has been commenced, and an order for relief has been entered, it can be dismissed.  And cases under the Code, filed under diverse chapters, frequently are dismissed, for inability to succeed; for failures to meet obligations imposed under the Code; or other cause—including bad faith filing and "unenumerated cause."[24] The Court finds that cause—unenumerated cause, if not also bad faith filing—to be present here.

This involuntary case was commenced under chapter 7, whose section 707(a) governs dismissal for cause.  Under section 707(a) of the Bankruptcy Code,[25] a chapter 7 case may be dismissed for cause.[26]  But the Bankruptcy Code does not define "cause."  And as the language

---

[24] The earliest use of the expression "unenumerated cause" appears, so far as this Court is aware, in Judge Kaplan's decision in *In re Head*, 223 B.R. 648, 654 (Bankr. W.D.N.Y. 1998) (Kaplan, C.J.), though as the discussion to follow indicates, Judge Kaplan was hardly breaking new ground.  The concept in the context in which he used it—use of the Code for purposes other than those for which it was intended, and failing to treat others in the case fairly—has been a repeating theme since the earliest days of the Code.

[25] Section 707(a) provides:

> (a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including—
>
>> (1) unreasonable delay by the debtor that is prejudicial to creditors;
>>
>> (2) nonpayment of any fees or charges required under chapter 123 of title 28; and
>>
>> (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

[26] Similarly structured provisions appear in other chapters of the Code.  *See* sections 930(a) (chapter 9); 1112(b) (chapter 11); 1208(c) (chapter 12); and 1307(c) (chapter 13).  Each likewise provides that a party in interest may move to dismiss a case filed under its particular chapter "for cause," "including" factors enumerated in that section.

of sections 707(a) and 102(3) makes clear[27]—as do principles emerging from the Second

Circuit's ruling in *C-TC*, the seminal case involving dismissal for cause in the Second Circuit,[28]

though *C-TC* was decided under the Code's closely similar section 1112(b)—the three examples

given in section 707(a), which follow the word "including," are illustrative, not exclusive.[29]

Many courts, including this one, have recognized that cause for dismissal (or relief from

the stay, whose standards are not substantively different)[30] may result from circumstances not

specifically mentioned in the Code—whether for bad faith[31] or circumstances falling short of bad

faith but nevertheless representing an inappropriate use of the Code.[32]  The seminal case in this

---

[27]     *See* section 707(a).  Then, under the Code's "Rules of Construction," bundled in section 102, the words
"'includes' and 'including' are not limiting…."  Bankruptcy Code Section 102(3).

[28]     *C-TC 9th Avenue Partnership v. Norton Comp.* (*In re C-TC 9th Avenue Partnership*), 113 F.3d 1304 (2d
Cir. 1997) ("***C-TC***").

[29]     *In re 82 Milbar Blvd. Inc.*, 91 B.R. 213, 221 (Bankr. E.D.N.Y. 1988) (Hall, J.) ("***Milbar Boulevard***") (in
chapter 7 case).  *See also C-TC*, 113 F.3d at 1311 & n.5 (in chapter 11 case, whose section 1112(b) is
structured the same as section 707(a), "[i]t is important to note that this list is illustrative, not exhaustive.").

[30]     Under section 362(d)(1) of the Code, relief from section 362's automatic stay can also be granted "for
cause."  *See* section 362(d)(1).  Motions for dismissal and for relief from the stay are governed by like
standards.  *See., e.g., In re Laguna Assocs. Ltd. P'ship*, 30 F.3d 734, 737-38 (6th Cir. 1994).  As Chief
Judge Brozman noted in *In re 234–6 West 22nd Street Corp.*, 214 B.R. 751 (Bankr. S.D.N.Y. 1997)
(Brozman, C.J.) ("***234-6 West 22nd***") in which she granted relief from the stay under section 362(d)(1) by
reason of bad faith filing, "the standards for bad faith as evidence of cause," whether in the context of
dismissal or relief from the stay, "are not substantively different from each other…. [W]hen faced with a
motion to lift the stay on bad faith grounds, a judge must conduct a careful analysis similar to that
performed with a motion to dismiss a case on bad faith grounds."  *234-6 West 22nd*, 214 B.R. at 757.  *See
also In re Setzer*, 47 B.R. 340, 344 (Bankr. E.D.N.Y. 1985) (Hall, J.) ("Bad faith has frequently been held
to provide sufficient cause to warrant both types of relief.").

[31]     *See, e.g., In re Eclair Bakery Ltd.*, 255 B.R. 121, 131-32 (Bankr. S.D.N.Y. 2000) (Gerber, J.) ("***Eclair
Bakery***") (relief from stay granted for cause in case of bad faith filing); *In re Kaplan Breslaw Ash, LLC*,
264 B.R. 309, 335 (Bankr. S.D.N.Y. 2001) (Gerber, J.) ("***Kaplan Breslaw Ash***") (relief from stay granted
for cause in case of bad faith filing); *In re Syndicom Corp.*, 268 B.R. 26, 55 (Bankr. S.D.N.Y. 2001)
(Gerber, J.) ("***Syndicom***") (debtor's filing of petition was in bad faith, warranting cause for both stay relief
and dismissal, though Court considered stay relief the preferable remedy under the circumstances).

[32]     *See*, *e.g., In re AMC Realty Corp.*, 270 B.R. 132, 146-47 (Bankr. S.D.N.Y. 2001) (Gerber, J.) ("***AMC***")
(though case was not filed in bad faith, there nevertheless was cause for both relief from the stay and
dismissal; under the circumstances, dismissal was the preferable remedy); *In re Pleasant East Assocs.*,
286 B.R. 509 (Bankr. S.D.N.Y. 2002) (Gerber, J.) ("***Pleasant East***") (though *C-TC* Factors were satisfied,
and case was conditionally dismissed, dismissal order stayed to allow debtor to commence litigation in
district court by which its business might be saved); *In re Century/ML Cable Venture*, 294 B.R. 9 (Bankr.
S.D.N.Y. 2003) (Gerber, J.) ("***Century/ML Cable Venture***") (motion to dismiss denied, as court found
neither bad faith nor unenumerated cause); *In re Balmer*, 2003 Bankr. LEXIS 2407, *6, 2003 WL

Circuit so holding, as previously noted, is *C-TC*, which, while involving a case under chapter

11—and thus a motion under section 1112(b)—dealt with the same right of a bankruptcy court to

dismiss a case before it for cause.

In *C-TC*, the Circuit affirmed the decision initially made by Judge Littlefield of the

Northern District of New York wherein Judge Littlefield found that the circumstances

surrounding the filing "indicated a lack of good faith on its part."[33]   Though the district court had

affirmed Judge Littlefield's decision on a second ground, the Circuit came back to Judge

Littlefield's bad faith analysis and expressly endorsed it.[34]   Among the several things that Judge

Littlefield had found as establishing bad faith, which supported the Circuit's conclusion when

Judge Littlefield's dismissal was once again affirmed, were the facts that the filing was the

outgrowth of a two-party dispute;[35] that the dispute "could be fully resolved in a non-bankruptcy

forum";[36] and that the primary function of the petition was to serve as a "litigation tactic."[37]

Starting with the findings Judge Littlefield had made, the Circuit then looked to factors first

---

22658196, *2 (Bankr. E.D. Ark. Oct. 10, 2003) (Evans, J.) (dismissal granted "for cause for an unenumerated reason" under section 707(a)); *In re Balco Equities, Ltd.*, 312 B.R. 734, 748-49 (Bankr. S.D.N.Y. 2004 (Morris, C.J.) (granting relief from the stay, relying on principle, articulated in *AMC*, that cause for either dismissal or relief from the stay could be found "based on unenumerated factors, including 'bad faith,' or failure to deal with creditors fairly even where 'bad faith' is not found"); *In re Original IFPC Shareholders, Inc.*, 317 B.R. 738, 749-50 (Bankr. N.D. Ill. 2004) (Cox, J.) (dismissing chapter 11 case for cause on unenumerated grounds, noting that "the 'good faith' doctrine of § 1112(b) is not concerned only with sanctioning the filer's subjective intent but also considers whether the Chapter 11 remedy is being utilized for the limited purposes intended."); *In re Graham*, 2007 Bankr. LEXIS 4749, *9, 2007 WL 7688740, *3 (Bankr. S.D. Ga. June 28, 2007) (Davis, J.) ("'Cause,' for either dismissal or relief from the stay, may be found based on unenumerated factors, including 'bad faith,' or failure to deal with creditors fairly even where 'bad faith' is not found.'"); *In re R & G Properties, Inc.*, 2009 Bankr. LEXIS 2048, *3-7, 2009 WL 2004211, *1-2 (Bankr. D. Vt. July 6, 2009) (Brown, J.) (on renewed motion to dismiss—after court had earlier declined to find bad faith filing or unenumerated cause, and thus had denied both relief from the stay and dismissal of chapter 11 case—determining that debtor's lack of a reasonable likelihood of rehabilitation gave rise to cause for dismissal).

[33]   *C-TC*, 113 F.3d at 1309.

[34]   *See id.* at 1309-1310.

[35]   *See id.* at 1309.

[36]   *Id.* at 1310.

[37]   *Id.* at 1309.

articulated in another case (first at the bankruptcy court level and then at the district court level),[38] and identified a number of additional things that future courts might look to—*none stated in the Bankruptcy Code*—in gauging whether a chapter 11 case filed by a debtor was a bad faith filing.[39]

The additional factors announced by the *C-TC* court—commonly referred to in the bankruptcy community as the "*C-TC* Factors"—continue in active use today, on both motions to dismiss and for relief from the stay (each of which, as noted, requires a showing of cause), principally in voluntary cases commenced to block foreclosures and other actions against property. But the principles articulated by the Circuit go substantially beyond cases filed merely to delay foreclosures. Especially after *C-TC*, "[i]t is settled in this circuit that '[c]ause for dismissal may be found based on unenumerated factors, including 'bad faith.'"[40]

Determinations whether to dismiss a bankruptcy case are within the discretion of the Court.[41] And the bankruptcy court has this discretion whether dismissal is sought on a basis specified in the Code, or on bad faith or other unenumerated cause. As a district judge in this

---

[38]   *See Pleasant Point Apts. Ltd. v. Kentucky Hous. Corp.,* 139 B.R. 828 (W.D. Ky. 1992).

[39]   *C-TC,* 113 F.3d at 1311-12.

[40]   *In re R & G Properties, Inc.,* 2009 Bankr. LEXIS 1320, *2-3, 2009 WL 1076703, at *1 (Bankr. D. Vt. Apr. 16, 2009) (Brown, J.) ("***R & G Properties I***"); *Century/ML Cable Venture,* 294 B.R. at 34 (*citing C–TC,* 113 F.3d at 1310).

[41]   *See, e.g., Peterson v. Atlas Supply Corp. (In re Atlas Supply Corp.),* 857 F.2d 1061, 1063 (5th Cir. 1988) ("***Atlas Supply***") ("Since equitable principles may be applied under the present Bankruptcy Code, the decision whether to grant a motion to dismiss a petition in bankruptcy lies within the discretion of the bankruptcy judge."); *Industrial Insurance Services, Inc. v. Zick (In re Zick),* 931 F.2d 1124, 1126 (6th Cir. 1991) (same, quoting *Atlas Supply*); *In re Woodbrook Associates,* 19 F.3d 312, 316 (7th Cir. 1994) ("A bankruptcy court has broad discretion under 11 U.S.C. § 1112(b) to dismiss a Chapter 11 case for cause."); *Milbar Boulevard,* 91 B.R. at 221 ("The determination of whether cause for dismissal exists, is a matter within the sound discretion of the court."); *Pleasant East,* 286 B.R. at 516 ("It is well established that determinations whether to dismiss or convert are within the discretion of the Court."); *R & G Properties I,* 2009 Bankr. LEXIS 1320, *3, 2009 WL 1076703, at *1 ("Determinations whether to dismiss ... are within the discretion of the Court.").

Court's neighboring district stated, "[a] bankruptcy court has discretion to determine what

additional circumstances, not enumerated in the statute, may constitute cause." [42]

In past decisions where it has dismissed or granted relief from the stay "for cause," this

Court has done so with a finding of "bad faith" in cases evidencing wrongful intent at the more

egregious end of the spectrum,[43] and dismissed for unenumerated cause in the remainder.[44]  This

case is on the dividing line between the two—but since cause can be found either way, where

this case falls on that dividing line does not matter.  Here undisputed facts establish:

- This Court is the most recent battlefield in a long-standing two party dispute.

- This case has been brought solely as a judgment enforcement mechanism.

- There are no creditors competing with each other to be first in line to collect on claims.  There are no other creditors to help. In fact, there are no other creditors.

- There being no other creditors, there is no need for *pari passu* distribution.

- Assuming, *arguendo*, that there were any fraudulent transfers that could be avoided and then recovered, the Law Firm could do so on its own, without resort to the bankruptcy court.

- The Law Firm has adequate remedies under nonbankruptcy law.

- The Law Firm is seeking bankruptcy solely to secure a benefit that it does not have under nonbankruptcy law, without a creditor community to protect whose needs might justify the invocation of bankruptcy law.

- No assets would be lost or dissipated in the event that the bankruptcy case did not continue.  The Law Firm's interest in

---

[42]    *Clear Blue Water, LLC. v. Oyster Bay Mgmt. Co., LLC,* 476 B.R. 60, 67 (E.D.N.Y. 2012) (Spatt, J.) (affirming dismissal of chapter 11 case).

[43]    *See*, *e.g.*, *Eclair Bakery, Kaplan Breslaw Ash,* and *Syndicom*, *supra* n.31.

[44]    *See*, *e.g.*, *AMC* and *Pleasant East, supra* n.32.

-11-

the Judgment, and its ability to enforce the Judgment against
the Apartment, will each remain.

- The debtor does not need, or want, a discharge.

These factors, especially in combination, cause this Court to conclude that this case does

not belong in the United States Bankruptcy Court.  Mr. Murray—and as importantly, the

bankruptcy system—deserve an order dismissing this case for cause.[45]

While the existence of a two-party dispute does not, by itself, warrant dismissal of a case

where there are other legitimate bankruptcy objectives to achieve (such as avoiding a fire sale of

significant estate assets, or providing an opportunity to appeal an adverse judgment),[46] it is a

factor repeatedly considered in determining whether cases are filed in good faith, or where there

otherwise is cause for dismissal.  And it weighs in favor of dismissal when it is present.[47]

---

[45]     As one of the several bases upon which he argues that the Law Firm filed the involuntary in bad faith, Mr. Murray contends that "this case was commenced by [the Law Firm] more than one year after [the Law Firm] last discussed settlement with [Mr. Murray] and was no doubt designed to provide [the Law Firm] with an edge and a tactical advantage to restart a settlement discussion premised on the threat of a sale under 11 U.S.C. § 363(h)."  Murray Opening Br. at 9.  Mr. Murray contends also that it is improper to file a bankruptcy case "to exert leverage upon the Alleged Debtor and his wife by threatening them with the potential forced sale by a chapter 7 trustee of the Apartment under 11 U.S.C. § 363(h)."  *Id.* at 8.  That such would be bad faith might be true (at least where there are no other creditor needs and concerns to protect), but the Court cannot make bad faith findings based on that without a better developed factual record and evidentiary hearing, which neither side requested.  Since this filing was improper for reasons wholly apart from this one, the Court does not need to make findings as to this, and does not rely on it as part of its decision.

[46]     *See, e.g., In re Sletteland*, 260 B.R. 657, 664, 667 (Bankr. S.D.N.Y. 2001) (Gropper, J.) (declining to find bad faith filing and to order dismissal even though case was occasioned by a two-party dispute, where debtor was pursuing an appeal of an adverse judgment that was its biggest, but not only, claim).

[47]     *See, e.g., C-TC*, 113 F.3d at 1312 ("While C–TC argues that the genuine disputes between C–TC and Norton should have given the lie to any claim of bad faith, the bankruptcy court examined these disputed matters and found them to be emblematic of a dispute limited to only two parties.  For such two-party disputes, the state court, which has been overseeing the case, is a preferable forum."); *The Robert and Joan Dennen Trust v. Dennen (In re Dennen)*, 539 B.R. 182, 187 (Bankr. D. Colo. 2015) (Tallman, J.) ("The interests of creditors or other interested parties will not be affected by completion of the parties' dispute in the state court. … The dispute between the Trust and the Debtor is strictly a two-party dispute.  There is no evidence before the Court of any potential for prejudice with respect to the interests of creditors or other interested parties in the bankruptcy case.  That lack of prejudice to the interests of creditors and others weighs in favor of granting relief.").

So does the exploitation of the bankruptcy court as a rented battlefield to collect the debt, especially when there are no other creditors to protect. That is the teaching of a case with many similarities to the one here, *Mountain Dairies*,[48] decided by Chief Judge Morris in this district.

In *Mountain Dairies*, as here, a creditor trying to recover from the debtor commenced an involuntary case against the debtor. And there, as here, the involuntary case was brought by a *single* creditor, and so far as the record reflected, there were no other creditors in that case either.[49] *Mountain Dairies* differed from this case, however, in that here the Law Firm's Judgment cannot be disputed, and in *Mountain Dairies*, at least part of that single creditor's debt was in dispute. That provided a basis for denial of an order for relief, and Judge Morris denied the order for relief for that reason.

But in analysis applicable here as well, Judge Morris also held that even if the single petitioning creditor were an eligible petitioner under section 303, she "would be compelled to abstain," because the case before her was "essentially a two-party dispute for which the parties have adequate remedies in state court."[50] And she added, in analysis equally applicable here, "*[t]he Bankruptcy court is not a collection agency.*"[51]

---

[48]   *In re Mountain Dairies, Inc.,* 372 B.R. 623 (Bankr. S.D.N.Y. 2007) (Morris, C.J.) ("**Mountain Dairies**").

[49]   *See id.* at 636.

[50]   *Id.* at 635-36.

[51]   *Id.* at 635 (emphasis added) (*citing In re Century Tile and Marble, Inc.,* 152 B.R. 688, 689 (Bankr. S.D. Fla. 1993), in which, in response to the bankruptcy court's "fervent admonishment" of an attorney "utilizing the bankruptcy court as a collection agency instead of going to state court where collection claims are properly filed," the attorney apologized, giving the court his word "that we will not use this type of device again, we will use the state court system where it should have belonged in the first place….").

   Also, as here, there was a potential claim for a fraudulent transfer in *Mountain Dairies*. But Judge Morris noted, as this Court has earlier, the provisions under New York state law available to creditors victimized by fraudulent conveyances, observing that there was a failure "to point to any remedy in this Court that would be unavailable in New York state court." 372 B.R. at 636.

-13-

Finally, Judge Morris compared and contrasted the facts in *Mountain Dairies* with another involuntary case before this Court, quite a few years ago, *In re Paper I Partners*.[52] There this Court, on an abstention motion, declined to abstain and allowed an involuntary case to proceed.  But in *Paper I Partners*, the case had been filed by *28 petitioning creditors*, and if the case did not continue in this Court, those creditors would be forced to "go around the country or the world to obtain relief," and "races to obtain judgments" would ensue.[53]  In the bankruptcy court, by contrast, "assets [could] be distributed in a *pari passu* manner."[54]  Thus, Judge Morris concluded, *Paper Partners I* had no relevance to the creditorless two-party dispute before her.

Here too, the distinction between this case and *Paper Partners* is obvious.

With participants in the bankruptcy system so often focusing solely on their own private needs and concerns, they often forget what the bankruptcy system was created to do.  What the Law Firm doesn't understand, or disregards, is that just as "[t]he bankruptcy court is not a collection agency,"[55] bankruptcy is not a judgment enforcement device.  Bankruptcy is a *collective remedy*, with the original purpose[56]—which continues to this day—to address the needs and concerns of creditors with competing demands to debtors' limited assets,[57] and with

---

[52]    283 B.R. 661 (Bankr. S.D.N.Y. 2002) (Gerber, J.) ("***Paper I Partners***").

[53]    *Id.* at 679.

[54]    *Id.*

[55]    *See Mountain Dairies,* n.51 *supra.*

[56]    For the history of bankruptcy law in the United States—an understanding of which helps considerably in understanding why the Law Firm's filing here is so offensive—*see generally* John Adriance Bush, *The National Bankruptcy Act of 1898, with Notes, Procedures and Forms* (1899) (the "***1898 Act***"); Charles Warren, *Bankruptcy in United States History* (1935) ("***Bankruptcy in U.S. History***")*;* Charles Jordan Tabb, *The History of the Bankruptcy Laws in the United States,* 3 ABI L. Rev. 5 (Spring 1995) ("***History of U.S. Bankruptcy Laws***"); David A. Skeel, Jr., *Debt's Dominion:  A History of Bankruptcy Law in America* (2001) ("***Debt's Dominion***");  Bruce H. Mann, *Republic of Debtors:  Bankruptcy in the Age of American Independence* (2003) ("***Republic of Debtors***"); Hon. Joan Feeney, Hon. Michael Williamson and Michael Stepan, *Bankruptcy Law Manual* (5th ed. 2014) ("***Bankruptcy Law Manual***"); and 1 *Collier on Bankruptcy* (16th ed. 2015) ("***Collier***") ¶ 20.01 et seq.

[57]    *See Bankruptcy Law Manual* § 14:1 ("In fact, bankruptcy in Anglo-American law began exclusively as a creditor's remedy for the orderly distribution of the debtor's assets.").

-14-

the understandable desire that the debtor's assets not go to the swiftest, or the most aggressive, of them.[58]

Over the years, the bankruptcy system's purposes expanded to accomplish other

---

*See also The 1898 Act* at 7 (The "humane enactment [of the Statute of Anne in 1706] has been followed in all subsequent legislation on the subject. It recognized that the object of the system is two-fold: (1) To dedicate the property of an insolvent debtor to the ratable payment of his debts; and (2) to grant him a discharge from his existing obligations …. It may be justly remarked that there is nothing more to be accomplished by any law on the subject; all other provisions are matters of detail more or less effectively designed to accomplish these ends.").

*See also* 1 *Collier* ¶ 1.01[1], "Purposes of Bankruptcy" (In the bankruptcy process, "through orderly and centralized liquidation or through reorganization or rehabilitation, creditors of equal priority receive ratable and equitable distributions designed to serve 'the prime bankruptcy policy of equality of distribution among creditors of the debtor.'") (quoting *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991), in turn quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 177-78 (1977)).

[58]    *See*, *e.g.*, *Debt's Dominion* at 3 ("The distinctive features of U.S. bankruptcy law date back to the final decades of the nineteenth century…. But the tone for the debates that would fill the nineteenth-century congressional records was first set in the earliest years of the Republic… [B]ankruptcy assured that creditors would have access to, and share equally in, the assets of an insolvent debtor….").

*See also id.* at 8 ("To complete the picture we should add one more brush-stroke—the choice between voluntary and involuntary bankruptcy … In the nineteenth century, … involuntary bankruptcy figured quite prominently. Creditors … saw a uniform, federal bankruptcy law as the best way to assure that everyone to whom a debtor owed money would be treated equally."); *id.* at 36 ("Merchants who engaged in interstate commerce complained bitterly and repeatedly that debtors played favorites when they ran into financial trouble. The favorites were family members and local creditors, not the out-of-state merchants."); *id.* at 42 ("[O]nly with involuntary bankruptcy, [commercial groups and their advocates] insisted, would creditors be assured a fair share of debtors' assets.").

*See also In re Gibraltar Amusements, Ltd.,* 291 F.2d 22, 27-28 (2d Cir. 1961) ("**Gibraltar Amusements**") (Friendly, J., dissenting) (explaining, in the context of involuntary cases, that in the time between the 1878 repeal of the 1867 Bankruptcy Act and the enactment of the 1898 Bankruptcy Act, "[a]lthough Eastern congressmen were willing to concede that voluntary bankruptcy was a good idea …, many of them were unwilling to enact a voluntary bill without accompanying involuntary features designed *to insure an equitable distribution* of a bankrupt's assets among his creditors, and, to that end, to abolish preferences. … Easterners countered that a properly restricted involuntary bankruptcy law was a benefit not only to creditors but to debtors as well. In the absence of such a law creditors become nervous; whenever the debtor's assets seem less than his liabilities, they are likely to grab them precipitously, thereby forcing the debtor to the wall, lest other creditors beat them to the draw and they get nothing.") (emphasis added); *Bankruptcy Law Manual* § 14:1 (explaining, in the context of discussion of the involuntary bankruptcy provisions of the 1898 Bankruptcy Act, "Congress intended to balance two conflicting goals: the need for an effective remedy for creditors to insure equal distribution of a debtor's assets, with the need to protect debtors from being forced into bankruptcy without sufficient justification. Creditors could obtain involuntary relief against a debtor upon proof that the debtor committed an "act of bankruptcy," such as a fraudulent conveyance, payment of a preference, or the appointment of an assignee or receiver, which jeopardized the equal treatment of creditors.").

important social goals: to bring an end to debtor's prison;[59] to provide for a discharge;[60] to rehabilitate debtors, and thus to capture going concern value for the benefits of the creditor community (as contrasted to selling off assets for scrap) and to save jobs;[61] and to benefit the communities in which debtors operate.[62] If any of those goals needed to be achieved here, a bankruptcy case likely, if not plainly, would make sense. But here they do not. And the bankruptcy court cannot properly be employed as a rented battlefield, to achieve ends for which it never was intended, and as a collection mechanism to achieve none of the goals the Court has just noted.

The Bankruptcy Code's historic purposes—and in particular, the purposes underlying its authorization to file involuntary petitions (including, importantly, the balancing of the need to provide equality of treatment of creditors with protection of debtors)[63]—cannot be disregarded

---

[59]    *See Republic of Debtors* at 79 ("The only consistency among debt laws in the eighteenth century was that every colony, and later every state, permitted imprisonment for debt…."); *Bankruptcy in U.S. History,* at 16-17 (advocates of the bankruptcy bill that ultimately became the first U.S. bankruptcy statute, in 1800, "pointed out the necessity of restoring to active trade-life the thousands of debtors then in jail"); *History of U.S. Bankruptcy Law,* 3 ABI L. Rev. at 14 ("Pressure had been brought for a national bankruptcy law by a crash in 1792, but nothing was done until 1797, when another panic caused widespread ruin and the imprisonment of thousands of debtors."). *See* generally *Republic of Debtors* Chapter 3 ("Imprisoned Debtors in the Early Republic"), for a discussion of the use of debtors' prison in the U.S. through the eighteenth century and even into the nineteenth.

[60]    Bankruptcy existed for hundreds of years before the introduction of the discharge, to achieve its original purpose of equality of treatment amongst competing creditors. England first introduced the discharge in 1705, *see Debt's Dominion* Introduction n.1; *History of U.S. Bankruptcy Law,* 3 ABI L. Rev. at 10, and colonies in what is now the U.S. introduced the discharge in the decades to follow. The discharge first appeared at the U.S. national level in the Bankruptcy Act of 1800, the nation's first bankruptcy statute, which was very similar to the 1732 English Act. *Id.* at 14-15.

[61]    *See, e.g., N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 527 (1984) ("the policy of Chapter 11 is to permit successful rehabilitation of debtors….").

[62]    *See, e.g., In re General Motors Corp.,* 407 B.R. 463, 474 (Bankr. S.D.N.Y. 2009) (Gerber, J.) (approving sale of GM as a going concern; "[a]s nobody can seriously dispute, the only alternative to an immediate sale is liquidation—a disastrous result for GM's creditors, its employees, the suppliers who depend on GM for their own existence, and the communities in which GM operates.").

[63]    As Judge Friendly explained in *Gibraltar Amusements*:

> Thus, the entire process that resulted in the enactment of the Act of
> 1898 was a pitched battle between those who wanted to give the
> creditor an effective remedy to assure equal distribution of a bankrupt's

when a single creditor tries to invoke the involuntary provisions as its personal judgment

enforcement device.  As the authors of the Bankruptcy Law Manual—two of them bankruptcy

judges—observe:

> The Code's provisions and the rules of procedure governing
> involuntary cases are strict because of the severe nature of
> involuntary relief and the extreme consequences to the
> debtor in being forced into bankruptcy.  On the one hand,
> involuntary petitions are favored because they can *prevent
> the diminution of assets* by a debtor and *provide equality of
> treatment among creditors*.  On the other hand, the filing of
> an involuntary petition has the potential of doing great
> harm the debtor [*sic.*], including loss of the right to use or
> transfer property, consequences from the denial of credit,
> and even embarrassment.  An involuntary petition is a
> powerful weapon and therefore the Code and Federal Rules
> of Bankruptcy Procedure include numerous requirements
> and restrictions to curtail misuse and to insure that the
> remedy is sought *only in appropriate circumstances.*[64]

Here such appropriate circumstances are entirely lacking.  The Debtor and his family will

suffer great harm, and the countervailing needs and concerns of creditors to avoid the diminution

of assets and to ensure equality of treatment among creditors are wholly absent.  Nor are there

any other bankruptcy objectives that might be achieved by the continuation of a bankruptcy case

in this Court.

If the Law Firm filed this case unaware of all of that, this case must be dismissed for

unenumerated cause.  If the Law Firm already knew that, its filing here was in bad faith.  But the

Court does not need to make a finding as to how ignorant the Law Firm was of the basic

---

> assets and those who were determined to protect the debtor from the
> harassment of ill-considered or oppressive involuntary petitions,
> including those by a single creditor interest.

*Gibraltar Amusements* (Friendly, J., dissenting), 291 F.2d at 28.

[64]   Bankruptcy Law Manual § 14:1 (emphasis added).

-17-

purposes for which the bankruptcy system exists, because either way, this case must be, and is, dismissed for cause.

Finally, the Court ties the knot on a related issue—whether a case can be dismissed, for cause, by reason of a *creditor's* inappropriate conduct, as contrasted to the more common scenario where the cause comes from the acts or affairs of the debtor.  Though there is not yet a case directly on point—because creditor abuse that would affect the invocation of the bankruptcy system normally comes up only in *involuntary* cases (which are less than 1/10 of 1% of all bankruptcy cases),[65] and then typically only, as in *Mountain Dairies*, when the court is considering entry of an order for relief—that question is easy.  Section 707(a)—like the Code's other dismissal provisions structured similarly[66]—does not distinguish between sources of the cause.  Section 707(a), like its brethren, focuses on the propriety of the invocation of the bankruptcy system—providing for remedies when the bankruptcy system should not have been invoked, or where its continued invocation is unwarranted.  Just as creditors can seek dismissal for cause when the circumstances warrant it, debtors and other parties in interest can do likewise.

## Conclusion

As Chief Judge Brozman observed in *234-6 West 22nd*:

> [W]hen faced with a motion to lift the stay on bad faith
> grounds, a judge must conduct a careful analysis similar to
> that performed with a motion to dismiss a case on bad faith
> grounds.  In both cases, the relief sought is an extraordinary
> remedy that requires careful examination of the facts on a
> case-by-case basis.  But where the circumstances require

---

[65]    *See Bankruptcy Law Manual* § 14:1 ("Statistics reflect that more than 99.9% of all bankruptcy cases are commenced by the debtor filing a voluntary petition.").

[66]    *See* n.26 *supra*.

such relief, and the cases granting both types of motions are legion, a judge must not shrink from ordering it.[67]

Here the circumstances require such relief.  This bankruptcy case has no *raison d'être*. The sole purpose for this filing is the desire of the debtor's only creditor to use bankruptcy as a judgment enforcement device—and to secure a debt collection remedy that is more potent in bankruptcy than the equivalent right under nonbankruptcy law.  That falls far short of a reason for commencing a process intended for the benefit of many creditors, not a single one, and for achieving other goals, none of which would be accomplished here.

Thus, for the reasons stated above, the case is dismissed.  Mr. Murray's additional request for sanctions is denied.

SO ORDERED.

Dated: New York, New York            *s/Robert E. Gerber*
      January 13, 2016            United States Bankruptcy Judge

---

[67]     *234-6 West 22nd*, 214 B.R. at 757.